Filed 11/24/14  In re Elyse W. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re ELYSE W., a Person Coming Under the Juvenile Court Law. | B255841 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK03740) |
| Plaintiff and Respondent, | |
| v. | |
| JIMMIE W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Philip Soto, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father Jimmie W. appeals from a juvenile court order concluding it would be detrimental to minor Elyse W. to place her with father pursuant to Welfare and Institutions Code section 361.2.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2014, five-year-old Elyse W. was living with her mother, Monica O., along with her four-month-old half brother, James O.[2] The Los Angeles County Department of Children and Family Services (DCFS) detained Elyse and James after receiving referrals indicating mother was exhibiting paranoid and erratic behavior, and she may have been using illegal drugs. Mother told family members she thought people were trying to kill her and the children. At one point, while in a two-story building, mother "was yelling and asking if the children would die upon impact on the floor if pushed." At times mother left Elyse with the maternal grandmother, but then demanded her back. Mother attempted to file a report with law enforcement alleging the maternal grandmother was "manipulating [Elyse] to not like the mother." On February 15, mother was taken to a hospital pursuant to a section 5150 hold. At the time of detention, father's whereabouts were unknown. The maternal grandmother reported he was incarcerated. Elyse was placed with her maternal aunt.

In late February, Father was located in Utah. He told DCFS he was unable to attend a hearing scheduled for March 4, but would attend the jurisdiction and disposition hearing later that month. Father wanted Elyse released to him, and he was willing to have his home in Utah assessed for placement.

A March 2014 jurisdiction and disposition report indicated father was married and living with his wife and four children in Utah. Another child of father's was living in Los Angeles with his mother. Father met mother when he was 18 years old. After mother became pregnant with Elyse, father and mother moved between the homes of the maternal grandmother and the paternal grandfather, until father and mother's relationship

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] James O. is not a subject of this appeal.

2

ended. Father denied any domestic violence with mother. According to father, while he lived in California he had telephone contact with mother and Elyse around once a week, and he visited Elyse "every couple of days." After he moved to Utah, father had telephone contact with mother and Elyse around twice per month. However, father had not had any contact with Elyse and mother for around one month before the dependency proceedings were initiated. Father explained that mother changed her telephone number a lot; when he heard from mother after a month she had a new telephone number. Mother informed father then that Elyse had been taken away. Until the dependency proceedings, father was unaware that mother had any mental health issues.

Father was involved in a dependency matter in December 2010. Allegations of emotional abuse of two of father's children were substantiated. Father admitted to DCFS that at one point he had a violent altercation with his wife. Father reported his wife stabbed or "cut" him after learning of his infidelity. According to father, their son was sleeping during the incident. Father also admitted that when police searched him on the day of the incident, cocaine powder was found in his pocket. The case was dismissed after father and his wife took domestic violence and parenting classes.

The jurisdiction and disposition report indicated father had suffered three criminal arrests. The first was a 2008 arrest for inflicting corporal injury on a spouse/cohabitant, which was dismissed, and a drug possession charge from the same date.[3] The jurisdiction and disposition report appeared to indicate charges were suspended and father was sent to drug court. Father also had a 2009 arrest for possession of a controlled substance, and a 2012 "fugitive from justice" arrest. Father told DCFS he was not arrested for possession of a controlled substance. He explained that he was arrested for receiving stolen property—a video game console—and he spent three months in jail. Father said he was

---

[3]     The jurisdiction and disposition report provides the same summary details for both the 2008 arrest and the 2010 dependency matter. Although this suggests the incident and arrest occurred either in 2008 or in 2010, it is not clear which is the correct date, or whether there were two separate incidents.

currently on probation and agreed to provide the social worker with the information for his probation officer.

A social worker interviewed Elyse for the report. With respect to Elyse's relationship with father, the report recounted: "When asked if she has seen her father, Elyse stated, 'Jimmie?' This investigator then asked the child if she calls her father 'Jimmie' and the child stated, 'No, Daddy.' This investigator asked Elyse if she know[s] where her Father lives and she stated, 'Utah.' When asked if she would like to visit with Father or live with Father, Elyse nodded and stated, 'No. He is far. I want to be close to my granny.' When asked if she misses Father, Elyse stated, 'I don't know . . . I haven't seen him.' When asked if she knows what Father looks like, Elyse stated, 'I don't know.' "

The maternal aunt told the social worker father had not contacted Elyse since she was detained and placed in the aunt's home. According to the aunt, Elyse did not remember father much and knew little about him. The aunt recalled that father only lived with mother in the maternal grandmother's house when Elyse was one year old, and he was never "constant" or consistent in contacting Elyse. The aunt told the social worker her family really loved Elyse and she was happy in their home. She opined: " '[Elyse] has been through a lot and we want to make sure she is a happy kid' . . . '[Father] is a stranger to her and Elyse has gone through a lot of changes already . . . I don't think that Elyse will have stability with her dad.' "

The maternal grandmother told a social worker father had no relationship with Elyse, he had not seen her since she was three years old, and he had never tried to visit her. She also said father was "aggressive," and he and mother fought a lot when they both lived with her. The maternal grandmother opined: " 'I don't think [father] can care for Elyse. He also has a strong character and he would fight a lot with my daughter so I would grab Elyse and take her to the living room so she didn't see that.' "

DCFS recommended that Elyse "address her relationship with her father in a therapeutic setting in order to reunify with father in the event that she does not reunify with mother," but did not recommend immediate placement with father. The report

4

concluded: "In regards to . . . Elyse . . . being released to the father. . . it appears that the child has not had consistent contact with the father for about two years. It is important to consider that, when asked if she would like to reside with her father, Elyse said no and reported she wants to remain close to her maternal grandmother . . . and that she wants to continue to reside in the home of her maternal aunt. . . . Due to the Court order dated 03/04/2014, the Department has initiated an I.C.P.C. to have [father's] home assessed in order to consider the release of the child to the father."

At the late March jurisdiction and disposition hearing, the juvenile court declared Elyse and her half-brother to be persons described by section 300. At disposition, counsel for DCFS argued Elyse did not want to reside with father and had only a minimal relationship with him. Although counsel noted DCFS did not blame father for the state of the relationship, he argued it was necessary to "deal with where the child is now," and she did not want to leave her placement with the maternal aunt. Counsel suggested conjoint counseling between father and Elyse, and argued "the child's best interests including her mental health and well-being must be taken into consideration . . . ."

The court noted it needed to find "a judgment detrimental to the child being returned to father," and asked Elyse's counsel for argument. Elyse's counsel informed the court Elyse wished to remain with the maternal aunt. Her counsel further argued: "It would be emotionally detrimental to uproot her and send her back now to Utah to a different state with a family that she really hasn't had much contact with in the past so I do believe it would be emotionally detrimental to uproot her." Father argued DCFS had not shown detriment to Elyse if placed with father under section 361.2. Father requested custody of Elyse and asked that the court either close the case with a custody order to him, or, as allowed under section 361.2, subdivision (b)(2), place Elyse with him and order a home visit within three months.

The juvenile court ordered Elyse removed from mother's custody. The court further concluded "it would be detrimental to the child to be returned to the father who is living out of state. So briefly have her suitably placed." The court indicated evaluation of father was to continue under an I.C.P.C. in Utah. Father was allowed unmonitored

5

telephone contact with Elyse, and unmonitored day visits if father was in California. The court denied father's request for family reunification services.

## DISCUSSION

**I.    The Juvenile Court's Ruling Under Section 361.2 Was Not Reversible Error**

On appeal, father contends: 1) the juvenile court prejudicially erred in failing to make required findings under section 361.2, subdivision (c); and 2) there was insufficient evidence to support a finding of detriment under section 361.2, subdivision (a). We find no basis for reversal.

Under section 361.2, subdivision (a), "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Subdivision (b) of the section provides several placement options if the court in fact places the child with the previously noncustodial parent. Under subdivision (c), "[t]he court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)." The juvenile court must make a detriment finding under subdivision (a) by clear and convincing evidence. (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)

Father argues that although the juvenile court expressly found placement with father would be detrimental to Elyse, the court did not comply with section 361.2, subdivision (c) because it did not explain the factual basis for its decision. However, the one case father cites to support his argument concerns a juvenile court failure to make an express finding of detriment, not the failure to state a detailed factual basis for an express detriment finding. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1078.) Father further fails to provide any legal argument to support the assertion that such a statement of reasons is required.

6

However, even assuming the juvenile court erred in this case by failing to explain the factual basis for its detriment finding, we would not find the error resulted in a miscarriage of justice. "We cannot reverse the court's judgment unless its error was prejudicial, i.e., ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citation.]" (*In re Abram L.* (2013) 219 Cal.App.4th 452, 463.)

We cannot conclude that even if the juvenile court had stated the factual basis for its determination that placing Elyse with father would be detrimental to her safety, protection, or physical or emotional wellbeing, that it is reasonably probable the court would have reached a decision more favorable to father. Although the juvenile court did not specifically reference section 361.2, it expressly acknowledged the necessary detriment finding required by the statute, and it requested specific argument on that issue. The court was clearly aware of the appropriate standard and applied it. These facts distinguish this case from those in which reviewing courts have found the juvenile court's failure to make a section 361.2, subdivision (a) detriment finding was prejudicial. (See e.g., *In re Abram L., supra,* 219 Cal.App.4th at pp. 461, 463-464; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1821, 1825.) Moreover, as discussed in greater detail below, substantial evidence supported the juvenile court's detriment finding. Thus, even if the juvenile court erred in failing to provide a statement of reasons for the detriment finding, we would find no prejudice.

## II.     Substantial Evidence Supported the Detriment Finding

When reviewing a juvenile court detriment finding, "[w]e review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that placement would be detrimental to the child. Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S., supra,* 218 Cal.App.4th at p. 1262.)

Here, substantial evidence supported the juvenile court's detriment finding. Father admitted a number of criminal arrests and he admitted at least some of the conduct leading to the arrests. Father was still on probation. He admitted the violent encounter with his wife, arising out of his infidelity, that resulted in her cutting him with a knife while at least one of his children was present in the home. He was involved in a dependency matter in 2010, in which emotional abuse allegations were substantiated. The maternal grandmother reported father was "aggressive" when living with mother in the maternal grandmother's home. Although father said he had regular telephone contact with mother and Elyse until shortly before the dependency proceedings were initiated, others reported father had not consistently maintained contact with Elyse. The maternal grandmother reported father made no effort to visit Elyse in person and he had not seen her for two years. Elyse barely knew father, did not want to live with him, and wanted to remain with the maternal aunt. She wanted to stay close to the maternal grandmother, with whom she had periodically lived while in mother's custody.

Several courts have concluded that a child's disinclination to live with a previously noncustodial parent is not enough, by itself, to sustain a juvenile court finding of detriment. Courts have reached the same conclusion regarding a child's lack of an established relationship with a previously noncustodial parent. (See e.g., *Patrick S., supra,* at pp. 1262, 1265; *In re Abram L., supra,* 219 Cal.App.4th at p. 464; *In re John M.* (2006) 141 Cal.App.4th 1564, 1570.) However, these were not the only factors in this case. In addition to Elyse's preference not to live with father and her lack of a relationship with him, the juvenile court could also consider father's history of criminal arrests, his admitted domestic violence with his current wife, the dependency matter involving his other children, and evidence that he had often fought with Elyse's mother. The court could also consider Elyse's established relationship with maternal relatives, which would be disrupted by a placement with father in Utah, and her stated desire to be near her maternal grandmother. (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1507 [although child's wishes do not control placement, court could properly consider child's reluctance to live with mother and his desire to remain in San Diego, where he had lived

8

for over six years]; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1423 [when determining detriment court could consider sibling relationship that would be disrupted if children were placed with father in Ohio].)  Considering all of the relevant factors, we conclude there was substantial evidence to support the juvenile court finding that placing Elyse with father would be detrimental to Elyse's safety, protection, or physical or emotional well-being.

## DISPOSITION

The order is affirmed.


BIGELOW, P.J.

We concur:


FLIER, J.


GRIMES, J.